UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

GERALD WILLIAMS,

          Plaintiff,

    v.

Sonny Perdue, Secretary of the U.S.
Department of Agriculture,

        Defendant.

Case No. 2:17-cv-00280-JCC

COMPLAINT AND
JURY DEMAND

Gerald Williams alleges, upon personal knowledge as to himself and upon information and belief as to all other matters, as follows:

**STATEMENT OF THE CASE**

1.   Gerald Williams brings this lawsuit against Sonny Perdue, in his official capacity as Secretary of the U.S. Department of Agriculture (USDA), to redress the retaliation Williams has suffered at the U.S. Forest Service (FS), a USDA sub-agency, because he engaged in protected equal employment opportunity (EEO) activity.

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

Complaint – Page 1 –

2.   Williams is an African-American male and a veteran FS firefighter whose performance record includes his successful eight-year tenure as the head of a firefighter squad known throughout the country as the Mt. Baker-Snoqualmie Initial Attack (MBSIA) Crew. Williams created the MBSIA Crew to diversify the fire organization within FS by recruiting, training, and permanently hiring women and racial minorities to combat the dangerous wildland fires that continue to wreak havoc in the West and Southwest regions of the United States.

3.   For years, Williams successfully recruited young women and men from rural areas like Darrington, WA and put them on the front lines with young women and men from urban areas like Renton, WA. The popularity of the MBSIA Crew grew rapidly and garnered Williams nationwide recognition. Recruits came from as far as Alabama to learn the art of wildland firefighting under Williams.

4.   In spite of Williams' success, FS management has continued to harass and retaliate against Williams because he (a) complained to FS management about the discriminatory conduct of his white subordinates who subjected their fellow black MBSIA crew members to provocative racist and homophobic remarks, death threats and physical assault; (b) challenged FS management's reckless mishandling of the fiasco resulting from his white subordinates' discriminatory conduct; and (c) filed an EEO complaint and encouraged his subordinates to do the same.  All hell broke loose for Williams after that.

5.   After he engaged in protected activity, FS management stripped Williams of his Superintendent role, his supervisor James "Britt" Davis leveled disciplinary actions against him, and as recent as 2017 and 2018, management has restricted his access to participate

Complaint – Page 2 –

on fire assignments by claiming that he lacks proper "certifications" although management has re-certified Williams, with no issues, for the last 30 years and continues to ask him to train firefighters for the very certifications that it claims he no longer has.

6.   When Fire Staff Officer, Deb Roy, was asked what happened to Williams' certifications, she indicated that an audit discovered that some of his documentation was "missing, lost or destroyed."  While Agency guidelines allow management to certify firefighters who may have lost certifications, Deb Roy and Mr. Williams' former supervisor, Anthony Engel, refuse to certify him.  Engel, however, certified Williams in the past, prior to Williams engaging in protected activity that named Mr. Engel as the responsible management official.

7.   Management has certified white firefighters who are similarly situated to Williams who have had missing credentials.

8.   For Williams and the parts of his region that have been ravaged by wild fires for the last three years, this retaliation has been costly. He was eligible to retire as of November 30, 2018 but without his certifications he cannot earn post-retirement income by continuing to work in the fire area. Management has demoted him: he can no longer serve as an Incident Commander or a Type 1 Firefighter; has lost and continues to lose significant income and important career advancement opportunities.  Instead of fighting fires, he trains recruits and then stays at the camp cleaning portable bathrooms and the campgrounds.  He has suffered severe emotional distress.

9.   FS management violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by retaliating against Williams and subjecting him to a hostile work environment.

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

Hence, under Title VII, Williams seeks declaratory and injunctive relief, compensatory damages, punitive damages, and other suitable equitable relief against USDA.

## JURISDICTION AND VENUE

10.  This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

11.  Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events that give rise to this lawsuit occurred in the Western District of the State of Washington.

## PARTIES

12.  Plaintiff Gerald Williams lives in Darrington, WA. He is a long-time FS employee and has worked as a Supervisory Forest Technician since January 2005.

13.  Defendant Sonny Perdue, sued in his official capacity, is the Secretary of the USDA.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.  Williams has complied with all procedural requisites to this lawsuit and has exhausted his administrative remedies.

## LEGAL BACKGROUND

15.  Title VII forbids an employer from taking an adverse employment action against an employee for engaging in Title VII protected activity, such as opposing conduct that he reasonably and in good faith believes is unlawful under Title VII or participating in the EEO process. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).

16.  In the retaliation context "an adverse employment action is adverse treatment that is reasonably likely to deter employees from engaging in [Title VII] protected activity. *Id.* at 1237.

Complaint – Page 4 –

17.  Title VII also forbids an employer from subjecting an employee to a work environment that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" in retaliation for the employee's opposition to discrimination or participation in the EEO process. *Id.* at 1244–46.

*18.* Title VII also forbids an employer from treating employees differently on the basis of race. *Id.*

## FACTUAL BACKGROUND

### Williams Founds the MBSIA Crew to Bolster FS's Diversity Efforts

19.  Williams founded the MBSIA Crew in 2005. It was formed to recruit persons from groups underrepresented within FS's fire organization—namely, women and racial minorities—in order to help FS build a diverse firefighter workforce. Williams ran the MBSIA Crew, serving as its superintendent, for eight years.

20. During fire season five permanent firefighters (an assistant superintendent and four squad leaders) served on Williams' leadership team. With the team's help, Williams supervised 14 to 16 temporary employees who aspired to become permanent firefighters.

21.  To become a permanent firefighter, a temporary employee must obtain a Type 1 firefighter certification. Obtaining the credential requires the temporary employee to complete several task books with the signature of a squad leader. Without a squad leader's signature on each task book, a temporary employee cannot advance in the Type 1 certification process.

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

22. Williams recruited in the rural and urban areas of Greater Seattle from 2005 to 2014. Each year, he went to schools and job fairs to recruit individuals belonging to the groups underrepresented within FS's fire organization—namely, women and racial minorities. His efforts were successful. More than 100 people were hired through the MBSIA Crew program during that period.

***Racial Tension Rocks the MBSIA Crew in 2013***

23. In the summer of 2013, Williams hired Thomas Taylor to serve as assistant superintendent. Chris Howells and Jamie Larsen were hired to serve as squad leaders. Howells, Taylor, and Larsen are white.

24. That year, the MBSIA Crew was the most racially diverse firefighter squad within FS's fire organization. Fifteen of its members were white; five were black.

25. Williams worked hard to maintain congeniality within the MBSIA Crew.

26. But Taylor undermined his efforts by engaging in racially antagonistic behavior.

27. Taylor made racially stigmatizing remarks to the black crew members. For instance, Taylor asked one black crew member whether he joined MBSIA to build his career or "buy new rims" for his car. Taylor also referred to the black crew members collectively as "the posse."

28. Once during physical training, Taylor physically assaulted Marleco Green, one of the black crew members. Taylor ran up behind Green abruptly while the group was running on a trail, causing him to fall and sprain his ankle. Shortly afterward, Taylor taunted and jeered at him, saying: "Keep running. Stop acting like a little bitch!" This was witnessed by several crew members.

Complaint – Page 6 –

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC 20002
Phone: (202) 792-4946

29. Taylor went out of his way to treat the black crew members less favorably than he did the white crew members. For instance, Taylor penalized the black crew members for offenses they did not commit, such as tardiness for physical training. But, as pointed out by squad leader Howells, when the white crew members were tardy for physical training, Taylor pretended not to notice and did not penalize them.

30. In addition, Taylor did not penalize white crew members for violating well-established MBSIA rules by bringing pets, firearms, and illegal substances onto MBSIA grounds.

31. Taylor also attacked Williams personally. He said that Williams was incompetent. And Taylor used racially coded language to criticize Williams' supervisory status and hiring efforts to train women and others from underrepresented groups. For instance, he said that FS had become "a welfare agency" that handed out jobs to undeserving, incompetent people.

32. Some of the white crew members were influenced by Taylor's racial antagonism. They often made racially stigmatizing remarks to the black crew members, asking questions such as "Why do black people eat fried chicken and drink grape soda?" These provocative remarks eventually gave way to racial epithets. Several black crew members reported being called "black monkeys" and "niggers."

33. By the end of the summer, most of the black crew members were having difficulty obtaining the credits they need toward their certification because assistant superintendent Taylor and squad leader Larsen refused to sign off on their task books.

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

34. This escalated the racial tension within the MBSIA Crew. Even James "Britt" Davis, Williams' direct supervisor who is white, acknowledged it. In Williams' ROI, he remarked that the MBSIA Crew at that time was divided into "two camps."

35. Davis also referred to the black crew members as "city kids."

***White Crew Members lodge death threats against black crew members; make homophobic remarks about Williams***

36. In early August of 2013, Williams learned from Darnell Dabney, a black crew member, that squad leader Jamie Larsen and crew member Jason Monteith, who is white, had recently exchanged text messages that were violent and homophobic. They communicated about going on "a murder rampage" and being frustrated with squad leader Howells, who had advocated for the black crew members that summer, because they believed he was trying to curry favor with Williams. They also ridiculed Williams' apparent sexuality—they repeatedly called him "*gayRald*"—and talked about poisoning him with Visine.

37. Around September of 2013, Williams reported the text messages and mounting racial tension to Phil Stanley, an HR official.

38. Stanley, who is white, told Williams that he could not file a union grievance or an EEO complaint, because Larsen and Monteith had exchanged the text messages on their personal cell phones.  He also instructed Williams to discuss the situation with no one else and to instruct his subordinates to do the same. Additionally, he told Williams to ensure that the text messages, which had been forwarded to Williams and several other FS employees, were deleted from all government devices.

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

39. Williams then made the same report to Davis, who responded by echoing Stanley's instructions.

40. Around September 18, 2013, Davis discussed the text messages and mounting racial tension with several MBSIA crew members and became fully aware of Larsen's unrelenting insubordinate attitude toward Williams. Around the same time, the National Federation of Federal Employees (NFFE) also became aware of Larsen and Monteith's text messages and the mounting racial tension within the MBSIA Crew.

**FS blocks Williams' ability to take corrective action against White Crew members who exhibited racist hatred towards their black subordinates and Williams**

41. About two months later, on November 12, 2013, Williams received a copy of a settlement agreement between FS and NFFE. The agreement was undated and devoid of factual detail. It also lacked a grievant's signature. It, however, included the following statement: "*Management has no intention to implement or take adverse disciplinary action or employment personnel actions on bargaining unit employees based solely on the text messages contained on the personal cell phones of Jamie Larsen and Jason Monteith.*"

42. This puzzled Williams for three reasons. First, the agreement expressly prevented him from exploring the possibility of initiating any disciplinary action against Larsen and Monteith for their obvious violations of MBSIA rules and USDA policy. Second, in his view, the agreement did not comport with USDA policy and the Master Agreement between FS and NFFE. Last, despite the harmful threats in Larsen and Monteith's text messages, FS management did not ask the Law Enforcement and Investigations Division

FORD LAW PROS PC
10 G Street, NE
Washington, DC 20002
Phone: (202) 792-4946

(LEI) to independently investigate the text messages, which violated USDA policy and the law. FS management's inaction is critical to Williams' legal claims.

43. Williams wanted to file an EEO complaint about Larsen and Monteith's text messages and toxic atmosphere that the messages created among MSBIA crew members. But the agreement discussed above, along with the instruction he received first from Stanley and then from Davis, stopped him.

***FS (Jennifer Eberlien) Retaliates Against Williams for Retaining Legal Counsel: disbands the MBSIA crew; reduces Williams' pay; and forbids him from working on fire assignments***

44. Sometime after delivering a copy of the suspicious agreement to Williams, FS management invited Williams to participate in a mediation related to the matter.

45. On January 28, 2014, Williams retained legal counsel and promptly informed FS management that Williams was represented.

46. About a week later, on February 5, 2014, FS management stripped Williams of his MBSIA supervisory duties and revoked his authority to rehire, recruit, and fill MBSIA crew positions.

47. Williams had communicated to FS management that he planned to rehire all the temporary MBSIA crew members, including all the black crew members who had complained about the way they were mistreated by Taylor, Larsen, and Monteith during the 2013 fire season.

48. FS management, including Davis and Forest Supervisor Jennifer Eberlien, decided to block Williams. As a result, on February 12, 2014, the MBSIA Crew was suspended for the remainder of the 2013 fire season.

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

49. The next month, FS management disbanded the MBSIA Crew for the May 2014 fire season. This altered Williams' job duties drastically because he could no longer hire or recruit for the MBSIA Crew.

50. That same month, on March 21, 2014, Davis assigned Williams and Howells to work in Darrington, WA with Taylor and Larsen.

51.  Davis also took away from Williams all fire-detail opportunities. This meant that Williams could no longer fight fires and earn overtime/hazard pay as he had done during previous fire seasons. Because of this change, Williams lost substantial earnings.

***FS (James "Britt" Davis) Retaliates Against Williams After He Files an EEO Complaint: reports Williams to law enforcement based on allegations of "criminal" conduct lodged against him by his former White subordinates and records him as AWOL on his time sheet to prevent him from being paid; Williams treating physician puts him on medical leave for several weeks due to stress from FS' actions.***

52. Williams filed an EEO complaint on April 16, 2014. The complaint included claims for retaliation and a hostile work environment. Williams positively identified Taylor, Larsen, and Monteith as the persons who, among other things, used racial slurs against black crew members; made violent treats against black crew members; treated black crew members less favorably by refusing to sign off on their task books, thereby hindering their advancement in the FS fire program; and physically assaulted Marleco Green.

53. Davis, Taylor, Larsen, and Monteith became fully aware of Williams' EEO complaint.

Complaint – Page 11 –

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

54. Two weeks later, on May 1, 2014, Larsen and Taylor accused Williams of bringing brass knuckles to work. Both of them knew that brass knuckles are dangerous weapons forbidden under MBSIA rules and USDA policy.

55. Early the next day, Davis relayed Taylor and Larsen's allegations against Williams to Raymond Huffman, an LEI law enforcement officer. Davis admitted to Huffman that he did not have the brass knuckles in his possession, that he had never seen them, and that no FS employee had received any threats from Williams. Still, Davis insisted that Huffman take criminal enforcement action against Williams. Huffman told Davis that there was no legitimate basis for charging Williams with criminal conduct because Davis could not produce the alleged brass knuckles.

56. Unbeknownst to Davis, Huffman knew about Williams' April 16, 2014 EEO complaint because Williams had sought his advice before filing it.

57. That same morning, Davis telephoned Williams to interrogate him about Taylor and Larsen's unsubstantiated allegations. Williams explained that they were false. Davis then directed him to stay home that day so that he could carefully prepare a written statement for Huffman.

58. When Williams submitted his written statement, Huffman told him that FS management got LEI involved because FS management was targeting him for termination.

59. This news, along with a toxic work environment and a substantial loss in earnings, caused Williams emotional distress.

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

Complaint – Page 12 –

60. On May 8, 2014, Williams learned that Davis had charged him for being Absent Without Official Leave (AWOL), a terminable offense, on May 2, 2014—the same day that Davis told Williams to stay home to complete his written statement before reporting back for work.

61.  The AWOL charge worsened Williams' emotional state. His emotional distress became so severe that, on the advice of his physician, he took medical leave from work for several weeks.

**Davis Persists in Retaliating Against Williams: forces him to work with Taylor, who previously discriminated against Black Crew Members, or Resign.**

62. On September 26, 2014, Davis intimidated Williams by giving him an ultimatum: (a) work with Taylor (Davis had transferred Taylor from the Darrington duty station to the Sedro-Wooley duty station because of the allegations about brass knuckles); (b) resign from his position; or (c) find another job. To add pressure, Davis promised Williams that the MBSIA Crew would remain disbanded if Williams refused to work with Taylor.

63. FS management later scheduled an internal, voluntary mediation with Williams as a part of the official EEO process. Davis was present.

64. Right afterward, Davis switched Williams' duty station from Darrington to Sedro-Wooley and told Williams that he would have to work with Taylor, resign, or be terminated for insubordination.

65. Williams protested. He told Davis that he was uncomfortable working with Taylor because Taylor had falsely accused him of breaking the law and was one of the persons

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

named in his EEO complaint. He also reminded Davis that Taylor and he were not on speaking terms. As a result, said Williams, FS management was forcing Williams to work in an abusive work environment that would cause him to perform poorly and lead to his termination.

66. Davis remained unmoved. He maintained that if Williams refused to work with Taylor at Sedro-Wooley, Williams would have to choose between resignation and termination.

67. Williams was also uncomfortable working closely with Davis at Sedro-Wooley. He believed Davis was biased against him because Davis had treated him less favorably than Taylor and Larsen, his white subordinates: Davis reported Taylor and Larsen's allegations about the brass knuckles, which he never saw, to LEI; Davis did not report Larsen and Monteith's violent text messages, which he actually saw, to LEI.

68. Less than one week afterward, Taylor confronted Williams during business hours and asked Williams if he had filed an EEO complaint against him. The confrontation with Taylor made Williams realize that Davis had disclosed information about his EEO complaint to Taylor and as a result had violated USDA's policies on workplace confidentiality.

69. Williams asked to be reassigned. Davis denied his request.

70. When Davis learned that Williams' EEO complaint was entering the formal investigation phase, Davis directed Larsen to apply for a detail (she did) and helped Taylor find a new position within FS.

71. Davis did not give Williams similar help.

Complaint – Page 14 –

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

72. In 2016, Howells applied for a MBSIA squad leader position and Williams recommended him for it. Under Davis's new hiring process, however, Howells was not hired.

73. Williams was the primary decision-maker for MBSIA hiring before he filed his EEO complaint. Davis designed the new hiring process—this has drastically diminished Williams' role in the hiring process—because of Williams' EEO complaint. As a result, Williams was unable to select Howells—the only white crew leader from the MBSIA Crew of 2013 who had worked to advance MBSIA's original purpose.

74. To be sure, FS removed Williams' hiring authority to prevent him from recruiting men and women of color thereby ending the diversity pipeline into the FS' fire organization.

75. On or about February 21, 2017, Williams filed a lawsuit in this Court against the Agency to litigate his claims.  The complaint (amended) was dismissed on procedural grounds.

### Agency Refuses to Permit Williams to Work Fire Assignments

76. Happy about the fortuitous dismissal of Williams' claim, Agency increased its retaliation against Williams, its officials feeling that they were truly beyond the reach of the law.

77. On or about March 2017, Mr. Williams took a detail to the Mt. Hood National Forest in Oregon where he would continue serving in his role as a firefighter and would also assist with training Job Corps recruits who want to become wildland firefighters. Mr. Williams was hired as a permanent on or about April 2017.

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

78. On or about July 2017, Mr. Williams asked Center Director, Kurt Davis, if he could go out on a fire assignment.  Davis contacted Fire Management Officer (FMO) Deb Roy (Roy) asking for permission.

79. Roy indicated that Mr. Williams did not seem to have the proper certifications to participate on any fire assignments.

80. Mr. Davis asked Roy to provide him with the specific documentation that was missing so that he could convey this to Mr. Williams.  Roy never responded.

81. It wasn't until October 2017 near the end of fire season, that Roy actually looked into the Incident Qualification Certification System (IQCS) to determine what, if any, documentation Williams was missing.

82. Roy determined that several items were missing from William's profile in IQCS and decided that he would not be able to take on fire assignments on this basis.

83. Forest Service Fire and Aviation Qualification Guide, Chapter 2, pt 1

2.22 - Record Keeping states: "The forest fire program management staff officer on each Forest shall ensure that certification records are maintained." It also states that where records are missing management can use alternative means to certify an individual fire fighter:  "If no copy of a qualifying position task book verification page can be located, verification may be accomplished with a letter or e-mail from the final evaluator validating: (1)Satisfactory completion of all tasks. (2)A recommendation that the individual be considered for certification.  (3)A list of the incident(s) and date(s) when the final evaluation and previously recommended certification was completed."

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

84. Roy refused to speak with Mr. William's prior FMO, Tony Engel, to obtain documentation that Williams- a 30-year firefighter and Incident Commander— had all documentation needed to accept fire assignments.

85. In December 2017, Roy told Mr. Williams in no uncertain terms that he would need to go back and locate documentation from 30 years ago before she would approve him to take any fire assignments.

86. On or about January 5, 2018, Mr. Williams went to Tony Engel, his former FMO from Mt. Baker, to ask him to write a letter to Roy as provided by 2.22 c(2).  Engel refused to do this, although Engel had written a similar letter dated November 28, 2003 for Mr. Williams' in the past to certify Williams as an ICT4 (Incident Commander Type 4).

87. After Mr. Williams' filed a lawsuit against the Agency, however, Engel refused to extend this opportunity to Williams.

88. To be sure, Mr. Williams had passed each and every audit the Forest Service conducted into his credentials until his lawsuit was filed in February 2017.

89. Once Mr. Williams filed his lawsuit against the Agency in federal court, he suddenly and mysteriously failed an "audit" that was conducted into his IQCS profile.

90. Mr. Williams' sent Roy all of his old task books, except the one for Task Force Leader, and other certifications and she still refused to approve him to go out on fire assignments.   As of now, Mr. Williams—a 30-year fire veteran—is only certified as an entry level firefighter (Type 2).

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

91. However, Agency management had Williams training firefighters and signing off on task books for training components for that which the Agency claims he is not certified.  Upon information and belief, the Agency has exercised discretion under Section 2.22 of the guidelines in favor of white firefighters by permitting an alternative means of certification for white firefighters so they could accept fire assignments.

92. Mr. Williams initiated his EEO complaint on September 17, 2017 and filed his formal complaint on January 12, 2018.

93. He has lost and continues to lose substantial earnings.

## CAUSES OF ACTION
### *Count 1: Hostile Work Environment*
### (Violation of Title VII)

94. Williams incorporates every preceding paragraph as alleged above.

95.  At all relevant times USDA was an "employer" under Title VII.

96. At all relevant times Williams was an "employee" under Title VII.

97. Williams engaged in protected activity when he complained about his white subordinates' discriminatory conduct, challenged FS management's mishandling of the fiasco resulting from the discriminatory conduct, and filed an EEO complaint on April 16, 2014.

98. USDA created and maintained an environment in which retaliatory intimidation, ridicule, and insult were so severe and pervasive that it altered the conditions of

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

Williams' employment and created a retaliatory hostile work environment, in violation of Title VII.

99.  This ongoing retaliatory hostile work environment includes, but is not limited to, the following actions taken by FS management: dissuading Williams from filing an EEO complaint after he reported Larsen and Monteith's text messages, which included statements about engaging in violence and poisoning Williams by putting Visine in his water bottle, and the mounting racial tension among MSBIA crew members caused by the unlawful discriminatory conduct of Taylor, Larsen, and several other white crew members; instructing Williams not to talk about the text messages and the mounting racial tension among MBSIA crew members with anyone; stripping Williams of his MBSIA supervisory duties; suspending the MBSIA Crew; disbanding the MBSIA Crew; revoking Williams' authority to rehire, recruit, and fill positions for the MBSIA Crew; charging Williams with AWOL; interrogating Williams about false allegations of violent conduct; forcing Williams to work with two white subordinates who had antagonized him or talked about poisoning him; denying Williams' request for reassignment after his white subordinates falsely accused him of bringing a dangerous weapon to work and badgered him for filing an EEO complaint; and repeatedly threatening to terminate Williams.

100.  The Agency also has refused to permit Mr. Williams to accept fire assignments, which substantially reduces his income.  Meanwhile the Agency allows white firefighters who have documentation missing to accept fire assignments.

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

101.  USDA is vicariously liable for the actions of every FS management actor involved in the events giving rise to this Complaint.

102.  USDA has directly and proximately caused Williams substantial economic loss, damage to his career and professional reputation, humiliation, pain, and suffering.

103.  USDA's actions were wanton, reckless, or in willful indifference to Williams' legal rights.

### *Count 2: Retaliation*
### (Violation of Title VII)

104.  Williams incorporates every preceding paragraph as alleged above.

105.  As a result of Williams' protected EEO activity, USDA took adverse employment actions against him. They include, but are not limited to, the following: dissuading Williams from filing an EEO complaint after Williams reported Larsen and Monteith's text messages, which included statements about engaging in violence and poisoning Williams by putting Visine in his water bottle, and the mounting racial tension among MBSIA Crew members caused by the unlawful discriminatory conduct of Taylor, Larsen, and several other white crew members; stripping Williams of his MBSIA Crew supervisory duties; revoking Williams' authority to rehire, recruit, and fill positions for the MBSIA Crew; suspending the MBSIA Crew; disbanding the MBSIA Crew; revoking the option for Williams to do fire details; forcing Williams to work with two white subordinates who had antagonized him and talked about poisoning him; repeatedly threatening to fire Williams; and denying his request for reassignment after his white subordinates falsely accused him of bringing a dangerous weapon to work and badgered him for filing an EEO complaint.

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

106. The Agency also has refused to permit Mr. Williams to accept fire assignments, which substantially reduces his income. Meanwhile the Agency allows white firefighters who have documentation missing to accept fire assignments.

USDA's retaliatory actions were causally connected to Williams' protected activity.

107. USDA's actions have directly and proximately caused Williams substantial economic loss, damage to his career and professional reputation, humiliation, pain, and suffering.

108. USDA's actions were wanton, reckless, or in willful indifference to Williams' legal rights.

### *Count 3: Discrimination (Race-Disparate Treatment)*

109. Williams incorporates every preceding paragraph as alleged above.

110. As a result of Williams' protected EEO activity, USDA took adverse employment actions against him. They include, but are not limited to, the following: dissuading Williams from filing an EEO complaint after Williams reported Larsen and Monteith's text messages, which included statements about engaging in violence and poisoning Williams by putting Visine in his water bottle, and the mounting racial tension among MBSIA Crew members caused by the unlawful discriminatory conduct of Taylor, Larsen, and several other white crew members; stripping Williams of his MBSIA Crew supervisory duties; revoking Williams' authority to rehire, recruit, and fill positions for the MBSIA Crew; suspending the MBSIA Crew; disbanding the MBSIA Crew; revoking the option for Williams to do fire details; forcing Williams to work with two white subordinates who had antagonized him and talked about poisoning him; repeatedly threatening to fire Williams; and denying his request for reassignment after his white

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

subordinates falsely accused him of bringing a dangerous weapon to work and badgered him for filing an EEO complaint.

111.  The Agency also has refused to permit Mr. Williams to accept fire assignments, which substantially reduces his income.  Meanwhile the Agency allows white firefighters who have documentation missing to accept fire assignments.

112.  USDA's actions have directly and proximately caused Williams substantial economic loss, damage to his career and professional reputation, humiliation, pain, and suffering.

113.  USDA's actions were wanton, reckless, or in willful indifference to Williams' legal rights.

**PRAYER**

WHEREFORE, Williams requests relief against USDA as follows:

a.  Enter judgment in his favor against USDA for retaliation in violation of Title VII;

b.  Enter judgment in his favor against USDA for subjecting his to a retaliatory hostile work environment in violation of Title VII;

c.  Award him compensatory damages of $500,000.00;

d.  Award him punitive damages, in an amount to be determined at trial;

e.  Award him attorney's fees and the costs of this litigation;

f.  Award him front pay and future benefits as may be appropriate;

g.  Enjoin USDA from discriminating against, retaliating against, or harassing him in any way;

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

h.  Award him appropriate prejudgment interest;

i.  Award such other relief as may be necessary and appropriate.

## JURY DEMAND

Williams demands a jury trial.

DATED: March 18, 2019                    Respectfully Submitted,

                                         s/ *Yaida O. Ford*
                                         Yaida O. Ford (WSBA #48723)
                                         **FORD LAW PROS PC**
                                         10 G Street, new, Ste. 600
                                         Washington, DC 20002
                                         Office: (202) 792-4946
                                         *yford@fordlawpros.com*

                                         *Attorney for Plaintiff*

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946