UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| GERALD WILLIAMS, | |
| Plaintiff, | |
| v. | Case No. 2:17-cv-00280-JCC |
| Sonny Perdue, Secretary of the U.S. Department of Agriculture, | FIRST AMENDED COMPLAINT AND JURY DEMAND |
| Defendant. | |

Gerald Williams alleges, upon personal knowledge as to himself and upon information and belief as to all other matters, as follows:

**STATEMENT OF THE CASE**

1.   Gerald Williams brings this lawsuit against Sonny Perdue, in his official capacity as Secretary of the U.S. Department of Agriculture (USDA), to redress the retaliation Williams has suffered at the U.S. Forest Service (FS), a USDA sub-agency, because he engaged in protected equal employment opportunity (EEO) activity.

FORD LAW PROS PC
10 G Street, NE
Washington, DC 20002
Phone: (202) 792-4946

2.   Williams is an African-American male and a veteran FS firefighter whose performance record includes his successful eight-year tenure as the head of a firefighter squad known throughout the country as the Mt. Baker-Snoqualmie Initial Attack (MBSIA) Crew. Williams created the MBSIA Crew to diversify the fire organization within FS by recruiting, training, and permanently hiring women and racial minorities to combat the dangerous wildland fires that continue to wreak havoc in the West and Southwest regions of the United States.

3.   For years, Williams successfully recruited young women and men from rural areas like Darrington, WA and put them on the front lines with young women and men from urban areas like Renton, WA. The popularity of the MBSIA Crew grew rapidly and garnered Williams nationwide recognition. Recruits came from as far as Alabama to learn the art of wildland firefighting under Williams.

4.   In spite of Williams' success, FS management has continued to harass and retaliate against Williams because he (a) complained to FS management about the discriminatory conduct of his white subordinates who subjected their fellow black MBSIA crew members to provocative racist and homophobic remarks, death threats and physical assault; (b) challenged FS management's reckless mishandling of the fiasco resulting from his white subordinates' discriminatory conduct; and (c) filed an EEO complaint and encouraged his subordinates to do the same.  All hell broke loose for Williams after that.

5.   After he engaged in protected activity, FS management stripped Williams of his Superintendent role, his supervisor James "Britt" Davis leveled disciplinary actions against him, and as recent as 2017 and 2018, management has restricted his access to participate

Complaint – Page 2 –

on fire assignments by claiming that he lacks proper "certifications" although management has re-certified Williams, with no issues, for the last 30 years and continues to ask him to train firefighters for the very certifications that it claims he no longer has.

6.   When Fire Staff Officer (FMO), Deb Roy, was asked what happened to Williams' certifications, she indicated that an audit discovered that some of his documentation was missing.  Deb Roy is White.

7.   The audit was conducted by the Mt. Hood NF Training Officer, Gerri Waters. Gerri Waters is White.

8.   While Agency guidelines allow management to certify firefighters who may have lost certifications, Deb Roy refused to certify him.  This was an odd decision because Williams arrived in June 2017 with a newly issues red-card. Anthony Engel was the certifying official. The card had an active date of June 22, 2017.

9.   After receiving his red card, on or about June 2017, Roy de-activated Williams' qualifications pending an "audit."

10.   It took Waters almost one year to complete Williams' audit although fire season was over in 2017 around October and did not begin again until March 2018.

11.   Waters definitely completed audits for White firefighters between October 2017 and December 2017 who were newer to Mt. Hood NF than Williams.

12.   Upon information and belief Waters delayed Williams audit due to the fact that he had filed an EEO complaint against her and Roy in September 2017 related to the initial suspension of his qualifications.

Complaint – Page 3 –

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

13.  What began as an initial suspension of Mr. Williams' qualifications became a decertification because Roy never re-activated his qualifications or provided him with the information he needed to have them restored.

14.  Roy ostensibly decertified Williams claiming that he lacked the proper documentation to back up the qualifications on his red card and in his electronic file.

15.  According to USFS practice and policy, firefighters are typically only decertified for acts of misconduct, abuse or gross neglect on the fire line.

16.  Anthony Engel, Williams' former Fire Management Office, certified Williams in the past, and continued certifying Williams up until Williams transferred to the Mt. Hood NF under Deb Roy's leadership in 2017.

17.  According to Engel, Williams' file was not missing all of the documentation Roy claimed was not in Williams' file when Williams was on the Mt. Baker NF.

18.  Roy did not follow USFS practice or policy when she failed to ensure that Williams or his direct supervisor were provided with specific options that Williams could employ to keep his qualifications other than repeating all courses and training, which would be nearly impossible for Williams to do in a reasonable time frame while working full-time as an instructor at the guard school.

19.  According to USFS practice and policy, Williams could have taught classes to earn some of the missing qualifications which would have been the easiest thing for him to do since he is a full-time instructor.

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

20. Roy intentionally failed to ensure that Williams had this information because of his race and in retaliation for Williams filing an EEO complaint against her on September 27, 2017.

21. Additionally, Roy intentionally utilized incorrect training policies to justify decertifying Mr. Williams.

22. Waters' audit showed that she relied on 1993 standards to determine that Williams was missing various courses and task books.

23. After Williams presented Waters and Roy with more than ten certificates and other documentation, Waters updated her findings in March 2018 to indicate that Williams was still missing a task book for FireFighter Type 1 ("FFT1"), Firefighter Type 2 ("FFT2") and Single Resource Boss.  However, Williams's master record bears an attainment date of 1996, when task books were **not** required for FFT1 or FFT2 positions.  Moreover, there is no such position as "Single Resource Boss."

24. At no time did Waters or Roy follow up with Williams to provide him with all of his options available to him so he could restore his qualifications.

25. This was not the first time Roy or Waters created obstacles for Black employees seeking fire qualifications or treated them less favorably than White fire fighters during the certification or re-certification process which is the exact same process utilized for a transfer audit like the one Williams underwent.

26. Moreover, USFS management in Region 6 have regularly re-certified white firefighters like Williams who have had missing credentials.  Some of those firefighters

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

have even served out of the same unit as Williams.  Despite them missing various required documents, they have never lost their qualifications on that basis.

27. For Williams and the parts of his region that have been ravaged by wild fires for the last three years, this treatment has been costly. He was eligible to retire as early as 2015 or November 30, 2018 but without his certifications there is no possibility that he will earn post-retirement income in the fire arena.

28. Roy's action of de-certifying Mr. Williams has permanently sabotaged his career but also sabotaged the diversity component of the job corps program for which he teaches.

29. As for Mr. Williams:  (1) all of his qualifications have lost currency, which means he has to re-do 30 years of training if he wishes to regain his most recent standing; (2) he has lost all career satisfaction as he can no longer serve as a Superintendent or recruit and hire firefighters with the goal of helping the organization retain the most qualified and diverse candidates; (3) he has lost and continues to lose significant income and important career advancement opportunities.  Instead of fighting fires and leading crews, he teaches certain courses at the guard school and then stays at the camp cleaning portable bathrooms and the campgrounds.

30. As for the damage to the job corps program: (1) Mr. Williams students cannot train with him for fire assignments because Roy de-certified all of his credentials; (2) Roy's actions also created obstacles for the students because they could not obtain red cards without Williams training them.  Without red cards, the students cannot apply for jobs within the fire organization.

Complaint – Page 6 –

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

31.  All of this has taken a toll on Mr. Williams and he has suffered severe emotional distress.

32.  FS management violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by retaliating against Williams and subjecting him to a hostile work environment. Hence, under Title VII, Williams seeks declaratory and injunctive relief, compensatory damages, punitive damages, and other suitable equitable relief against USDA.

33.  Williams filed an EEO complaint against Roy and Waters and they both subsequently retired.

## JURISDICTION AND VENUE

34.  This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

35.  Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events that give rise to this lawsuit occurred in the Western District of the State of Washington.

## PARTIES

36.  Plaintiff Gerald Williams lives in Darrington, WA. He is a long-time FS employee and has worked as a Supervisory Forest Technician since January 2005.

37.  Defendant Sonny Perdue, sued in his official capacity, is the Secretary of the USDA.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

38.  Williams has complied with all procedural requisites to this lawsuit and has exhausted his administrative remedies.

Complaint – Page 7 –

**LEGAL BACKGROUND**

39. Title VII forbids an employer from taking an adverse employment action against an employee for engaging in Title VII protected activity, such as opposing conduct that he reasonably and in good faith believes is unlawful under Title VII or participating in the EEO process. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).

40. In the retaliation context "an adverse employment action is adverse treatment that is reasonably likely to deter employees from engaging in [Title VII] protected activity. *Id.* at 1237.

41. Title VII also forbids an employer from subjecting an employee to a work environment that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" in retaliation for the employee's opposition to discrimination or participation in the EEO process. *Id.* at 1244–46.

42. Title VII also forbids an employer from treating employees differently on the basis of race. *Id.*

**FACTUAL BACKGROUND**

***Williams Founds the MBSIA Crew to Bolster FS's Diversity Efforts***

43. Williams founded the MBSIA Crew in 2005. It was formed to recruit persons from groups underrepresented within FS's fire organization—namely, women and racial minorities—in order to help FS build a diverse firefighter workforce. Williams ran the MBSIA Crew, serving as its superintendent, for eight years.

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

44. During fire season five permanent firefighters (an assistant superintendent and four squad leaders) served on Williams' leadership team. With the team's help, Williams supervised 14 to 16 temporary employees who aspired to become permanent firefighters.

45. To become a permanent firefighter, a temporary employee must obtain a Type 1 firefighter certification. Obtaining the credential requires the temporary employee to complete several task books with the signature of a squad leader. Without a squad leader's signature on each task book, a temporary employee cannot advance in the Type 1 certification process.

46. Williams recruited in the rural and urban areas of Greater Seattle from 2005 to 2014. Each year, he went to schools and job fairs to recruit individuals belonging to the groups underrepresented within FS's fire organization—namely, women and racial minorities. His efforts were successful. More than 100 people were hired through the MBSIA Crew program during that period.

### Racial Tension Rocks the MBSIA Crew in 2013

47. In the summer of 2013, Williams hired Thomas Taylor to serve as assistant superintendent. Chris Howells and Jamie Larsen were hired to serve as squad leaders. Howells, Taylor, and Larsen are White.

48. That year, the MBSIA Crew was the most racially diverse firefighter squad within FS's fire organization. Fifteen of its members were white; five were black.

49. Williams worked hard to maintain congeniality within the MBSIA Crew.

50. But Taylor undermined his efforts by engaging in racially antagonistic behavior.

Complaint – Page 9 –

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

51.  Taylor made racially stigmatizing remarks to the black crew members. For instance, Taylor asked one black crew member whether he joined MBSIA to build his career or "buy new rims" for his car. Taylor also referred to the black crew members collectively as "the posse."

52. Once during physical training, Taylor physically assaulted Marleco Green, one of the black crew members. Taylor ran up behind Green abruptly while the group was running on a trail, causing him to fall and sprain his ankle. Shortly afterward, Taylor taunted and jeered at him, saying: "Keep running. Stop acting like a little bitch!" This was witnessed by several crew members.

53. Taylor went out of his way to treat the black crew members less favorably than he did the white crew members. For instance, Taylor penalized the black crew members for offenses they did not commit, such as tardiness for physical training. But, as pointed out by squad leader Howells, when the white crew members were tardy for physical training, Taylor pretended not to notice and did not penalize them.

54. In addition, Taylor did not penalize white crew members for violating well-established MBSIA rules by bringing pets, firearms, and illegal substances onto MBSIA grounds.

55. Taylor also attacked Williams personally. He said that Williams was incompetent. And Taylor used racially coded language to criticize Williams' supervisory status and hiring efforts to train women and others from underrepresented groups. For instance, he said that FS had become "a welfare agency" that handed out jobs to undeserving, incompetent people.

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

56. Some of the white crew members were influenced by Taylor's racial antagonism. They often made racially stigmatizing remarks to the black crew members, asking questions such as "Why do black people eat fried chicken and drink grape soda?" These provocative remarks eventually gave way to racial epithets. Several black crew members reported being called "black monkeys" and "niggers."

57. By the end of the summer, most of the black crew members were having difficulty obtaining the credits they need toward their certification because assistant superintendent Taylor and squad leader Larsen refused to sign off on their task books.

58. This escalated the racial tension within the MBSIA Crew. Even James "Britt" Davis, Williams' direct supervisor who is White, acknowledged it. In Williams' ROI, he remarked that the MBSIA Crew at that time was divided into "two camps."

59. Davis also referred to the black crew members as "city kids."

***White Crew Members lodge death threats against black crew members; make homophobic remarks about Williams***

60. In early August of 2013, Williams learned from Darnell Dabney, a black crew member, that squad leader Jamie Larsen and crew member Jason Monteith, who is white, had recently exchanged text messages that were violent and homophobic. They communicated about going on "a murder rampage" and being frustrated with squad leader Howells, who had advocated for the black crew members that summer, because they believed he was trying to curry favor with Williams. They also ridiculed Williams' apparent sexuality—they repeatedly called him "*gayRald*"—and talked about poisoning him with Visine.

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

61.  Around September of 2013, Williams reported the text messages and mounting racial tension to Phil Stanley, an HR official.

62. Stanley, who is white, told Williams that he could not file a union grievance or an EEO complaint, because Larsen and Monteith had exchanged the text messages on their personal cell phones.  He also instructed Williams to discuss the situation with no one else and to instruct his subordinates to do the same. Additionally, he told Williams to ensure that the text messages, which had been forwarded to Williams and several other FS employees, were deleted from all government devices.

63. Williams then made the same report to Davis, who responded by echoing Stanley's instructions.

64. Around September 18, 2013, Davis discussed the text messages and mounting racial tension with several MBSIA crew members and became fully aware of Larsen's unrelenting insubordinate attitude toward Williams. Around the same time, the National Federation of Federal Employees (NFFE) also became aware of Larsen and Monteith's text messages and the mounting racial tension within the MBSIA Crew.

**_FS blocks Williams' ability to take corrective action against White Crew members who exhibited racist hatred towards their black subordinates and Williams_**

65. About two months later, on November 12, 2013, Williams received a copy of a settlement agreement between FS and NFFE. The agreement was undated and devoid of factual detail. It also lacked a grievant's signature. It, however, included the following statement: "_Management has no intention to implement or take adverse disciplinary action_

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

*or employment personnel actions on bargaining unit employees based solely on the text messages contained on the personal cell phones of Jamie Larsen and Jason Monteith.*"

66. This puzzled Williams for three reasons. First, the agreement expressly prevented him from exploring the possibility of initiating any disciplinary action against Larsen and Monteith for their obvious violations of MBSIA rules and USDA policy. Second, in his view, the agreement did not comport with USDA policy and the Master Agreement between FS and NFFE. Last, despite the harmful threats in Larsen and Monteith's text messages, FS management did not ask the Law Enforcement and Investigations Division (LEI) to independently investigate the text messages, which violated USDA policy and the law. FS management's inaction is critical to Williams' legal claims.

67. Williams wanted to file an EEO complaint about Larsen and Monteith's text messages and toxic atmosphere that the messages created among MSBIA crew members. But the agreement discussed above, along with the instruction he received first from Stanley and then from Davis, stopped him.

***FS management Retaliates Against Williams for Retaining Legal Counsel: disbands the MBSIA crew; reduces Williams' pay; and forbids him from working on fire assignments***

68. Sometime after delivering a copy of the suspicious agreement to Williams, FS management invited Williams to participate in a mediation related to the matter.

69. On January 28, 2014, Williams retained legal counsel and promptly informed FS management that Williams was represented.

Complaint – Page 13 –

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

70. About a week later, on February 5, 2014, FS management, namely Britt Davis, stripped Williams of his MBSIA supervisory duties and revoked his authority to rehire, recruit, and fill MBSIA crew positions.

71. Williams had communicated to FS management that he planned to rehire all the temporary MBSIA crew members, including all the black crew members who had complained about the way they were mistreated by Taylor, Larsen, and Monteith during the 2013 fire season.

72. FS management, including Davis and Forest Supervisor Jennifer Eberlien, decided to block Williams. As a result, on February 12, 2014, the MBSIA Crew was suspended for the remainder of the 2013 fire season.

73. The next month, FS management disbanded the MBSIA Crew for the May 2014 fire season. This altered Williams' job duties drastically because he could no longer hire or recruit for the MBSIA Crew.

74. That same month, on March 21, 2014, Davis assigned Williams and Howells to work in Darrington, WA with Taylor and Larsen.

75. Davis also took away from Williams all fire-detail opportunities. This meant that Williams could no longer fight fires and earn overtime/hazard pay as he had done during previous fire seasons. Because of this change, Williams lost substantial earnings.

***FS (James "Britt" Davis) Retaliates Against Williams After He Files an EEO Complaint.***

76. Williams filed an EEO complaint on April 16, 2014. The complaint included claims for retaliation and a hostile work environment. Williams positively identified Taylor,

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

Larsen, and Monteith as the persons who, among other things, used racial slurs against black crew members; made violent treats against black crew members; treated black crew members less favorably by refusing to sign off on their task books, thereby hindering their advancement in the FS fire program; and physically assaulted Marleco Green.

77. Davis, Taylor, Larsen, and Monteith became fully aware of Williams' EEO complaint.

78. Two weeks later, on May 1, 2014, Larsen and Taylor accused Williams of bringing brass knuckles to work. Both of them knew that brass knuckles are dangerous weapons forbidden under MBSIA rules and USDA policy.

79. Early the next day, Davis relayed Taylor and Larsen's allegations against Williams to Raymond Huffman, an LEI law enforcement officer.

80. Huffman is White.

81. Davis admitted to Huffman that he did not have the brass knuckles in his possession, that he had never seen them, and that no FS employee had received any threats from Williams. Still, Davis insisted that Huffman take criminal enforcement action against Williams.

82. Huffman told Davis that there was no legitimate basis for charging Williams with criminal conduct because Davis could not produce the alleged brass knuckles.

83. Unbeknownst to Davis, Huffman knew about Williams' April 16, 2014 EEO complaint because Williams had sought his advice before filing it.

84. That same morning, Davis telephoned Williams to interrogate him about Taylor and Larsen's unsubstantiated allegations. Williams explained that they were false. Davis

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

then directed him to stay home that day so that he could carefully prepare a written statement for Huffman.

85. After Williams submitted his written statement to Huffman, Huffman told him that FS management got LEI involved because FS management was targeting him for termination.

86. This news, along with a toxic work environment and a substantial loss in earnings, caused Williams severe emotional distress.

87. On May 8, 2014, Williams learned that Davis had charged him for being Absent Without Official Leave (AWOL), a terminable offense, on May 2, 2014—the same day that Davis told Williams to stay home to complete his written statement before reporting back for work.

88. The AWOL charge worsened Williams' emotional state. His emotional distress became so severe that, on the advice of his physician, he took medical leave from work for several weeks.

***Davis Persists in Retaliating Against Williams: forces him to work with Taylor, who previously discriminated against Black Crew Members, or Resign.***

89. On September 26, 2014, Davis intimidated Williams by giving him an ultimatum: (a) work with Taylor (Davis had transferred Taylor from the Darrington duty station to the Sedro-Wooley duty station because of the allegations about brass knuckles); (b) resign from his position; or (c) find another job. To add pressure, Davis promised Williams that the MBSIA Crew would remain disbanded if Williams refused to work with Taylor.

Complaint – Page 16 –

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

90. FS management later scheduled an internal, voluntary mediation with Williams as a part of the official EEO process. Davis was present.

91. Right afterward, Davis switched Williams' duty station from Darrington to Sedro-Wooley and told Williams that he would have to work with Taylor, resign, or be terminated for insubordination.

92. Williams protested. He told Davis that he was uncomfortable working with Taylor because Taylor had falsely accused him of breaking the law and was one of the persons named in his EEO complaint. He also reminded Davis that Taylor and he were not on speaking terms.

93. This was a toxic situation and Davis was setting Williams up to work in an abusive work environment that would cause him to either quit or potentially lead to his termination. After expressing these factors to Davis, Williams asked Davis to reconsider.

94. Davis remained unmoved. He maintained that if Williams refused to work with Taylor at Sedro-Wooley, Williams would have to choose between resignation and termination. This retaliatory action further alienated Williams.

95. Williams was uncomfortable working closely with Davis at Sedro-Wooley. He believed Davis was biased against him because Davis had treated him less favorably than Taylor and Larsen, his white subordinates: Davis reported Taylor and Larsen's allegations about the brass knuckles, which he never saw, to LEI; Davis did not report Larsen and Monteith's violent text messages, which he actually saw, to LEI.

96. Less than one week afterward, Taylor confronted Williams during business hours and asked Williams if he had filed an EEO complaint against him.

Complaint – Page 17 –

FORD LAW PROS PC
10 G Street, NE
Washington, DC 20002
Phone: (202) 792-4946

97. The confrontation with Taylor made Williams realize that Davis had disclosed information about his EEO complaint to Taylor and as a result had violated USDA's policies on workplace confidentiality.

98. Williams asked to be reassigned. Davis denied his request.

99. When Davis learned that Williams' EEO complaint was entering the formal investigation phase, Davis directed Larsen to apply for a detail (she did) and helped Taylor find a new position within FS.

100.      Davis did not give Williams similar help in finding another position.

101. In 2016, Howells applied for a MBSIA squad leader position and Williams recommended him for it. Under Davis's new hiring process, however, Howells was not hired.

102.      Williams was the primary decision-maker for MBSIA hiring before he filed his EEO complaint. Davis designed the new hiring process—this has drastically diminished Williams' role in the hiring process—because of Williams' EEO complaint. As a result, Williams was unable to select Howells—the only white crew leader from the MBSIA Crew of 2013 who had worked to advance MBSIA's original purpose.

103.      To be sure, Davis removed Williams' hiring authority to prevent him from recruiting men and women of color thereby ending the diversity pipeline into the FS' fire organization.

104.      On or about February 21, 2017, Williams filed a lawsuit in this Court against the Agency to litigate his claims.  The complaint (amended) was dismissed on procedural grounds.

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

### Agency Refuses to Permit Williams to Work Fire Assignments

105.     Happy about the fortuitous dismissal of Williams' claim, the Agency increased its retaliation against Williams, its officials feeling that they were truly beyond the reach of the law. As a result, Williams took a detail in March 2017 to a job corps unit located at the Mt Hood NF where he served as a forestry and fire instructor.

106.     As a forestry instructor, he would continue serving in his role as a firefighter and would also assist with training Job Corps recruits who want to become wildland firefighters. Mr. Williams was hired as a permanent on or about April 2017.

107.     Unbeknownst to Williams, he would face the same racist culture at the Mt. Hood.

108.     Deb Roy had been the FMO for Mt. Hood and the Gifford Pinchot for several years.  In that time period there was only one other Black fire fighter whose qualifications were presented to her for certification.  His name is Kurt Davis.

109.     Mr. Davis' supervisor presented a Crew Boss task book that Davis had successfully completed with a signature by his final evaluator to Roy for final certification.

110. Roy refused to sign off on Davis' task book as a certifying official.

111. Waters reviewed the training records of two Black male employees on the Mt. Hood NF.

112. Waters refused to issue qualifications for FFT2 to either of them claiming that certain "documentation" was not turned in. However, she issued the same qualification to a White fire fighter who had less experience than both of the Black employees and who lacked the same documentation that they allegedly lacked.

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

113. As for Roy, the next Black fire fighter who came before her for certification was Williams.  Just as she did with Davis, Roy refused to sign off on Williams' documentation as a certifying official.

114. Williams, a much more senior and advanced fire fighter than Davis, who had no history of incidents out on the fire line in the 30 years he had been out and who had served on literally hundreds of fires, was now facing the disintegration of his career.

115. Roy refused to sign off on Williams' red card because he was missing certain certifications.  However, many of those certifications were not required at the time he attained his qualifications and according to Agency policy, a firefighter does not have to fulfill new requirements so long as his or her qualifications do not lapse.

116. Prior to working for Roy, Williams' qualifications never lapsed.

117. Even though Williams was missing some courses and task books, he provided more than a dozen courses and task books to Waters.

118. In the end of her "audit", which took approximately 9 months, she found that Williams was missing taskbooks for FFT1, FFT2, and Single Resource.  However, all of these items were contained in his Master Record.

119. Moreover, the Agency did not require taskbooks for FFT1 or FFT2 when Williams attained those qualifications and there is no such thing as a stand-alone Single Resource position.

120.        Williams' his Master Record indicated that he had served as a Crew Boss/Single Resource more than 78 times in his career.  Therefore, there was no valid question as to whether Williams was qualified for this position.

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

121. For Roy or Waters, this was not enough proof of his competence.  This is where Agency policy and practice comes into consideration.

122.     According to Agency policy and practice, Williams should have received the benefit of a qualifications review committee so that he could appeal its findings but Roy failed to provide Williams with this option.

123.     According to Agency policy and practice, when a firefighter is missing certifications from his or her hard file, the certifying official can still sign off on their qualifications with their rationale for why they did so; the firefighter can provide third-party verification of the classes s/he took through an instructor's affidavit or course roster; s/he can teach the class for which he is missing certifications; or a qualifications review committee can convene to determine whether s/he should be certified.

124.     In each case, the training officer works directly with the fire fighter to make sure s/he obtains the proper documentation so that s/he can serve on the fire line.

125.     In Mr. Williams' case Waters and Roy refused to communicate directly with Mr. Williams about these issues that are suddenly threatening his career, which is inconsistent with Agency practice and culture.

126.     There is evidence that Waters worked directly with White firefighters who were missing documents so that they could retain their certifications.

127.     There is evidence that Roy has issued certifying letters for White firefighters who are missing documentation so that they could retain their certifications.

128.     Had Waters or Roy actually spoken to Mr. Williams about his Master Record, they would have discovered that the attainment dates on his Master Record for

Complaint – Page 21 –

some of the positions in question (i.e. FFT1) were incorrect, which could have assisted Ms. Waters in conducting a more accurate audit with reliable findings.

129.     Waters noted in her preliminary August 2017 audit, that there were discrepancies within Williams' Master record but neither she nor Roy engaged in the usual interactive process to help resolve the discrepancies his record.

130.     Roy never convened a qualifications review committee per standard Agency practice.

131. The first inquiry into the status of Williams' qualifications came on or about July 2017, when Davis contacted Roy asking if Williams could be dispatched for fire assignments since fire season was busy.

132.     Roy indicated that Mr. Williams did not seem to have the proper certifications to participate on any fire assignments.

133. Mr. Davis asked Roy to provide him with the specific documentation that was missing so that he could convey this to Mr. Williams.  Roy never responded.

134.     Growing weary from waiting, Williams filed an EEO complaint in September 2017 against Roy and Waters.

135.      It wasn't until November 29, 2017 after the season was over, that a regional audit was conducted.  This happened at the behest of Davis' superiors at the job corps—namely Clay Fowler.

136.     The Regional Audit determined that more than 15 documents were missing from William's profile after which time Roy still failed to respond to any requests from Davis asking for specific ways to get Williams on the fire line so that he could teach that trade to the job corps students.

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

137.      According to Waters, Williams' file actually contained several of the documents that the Regional audit claimed he was missing. Knowing that the Regional Audit was unreliable, Waters never contacted the Regional Office or informed Deb Roy. Instead, Waters, by her own testimony, relied on the erroneous audit and concluded that Williams was not eligible for re-certification.

138.      Davis pleaded with Roy because the stability of the job corps was riding on Williams' ability to teach the fire trade. Davis' goal was to have Williams start up a crew through the job corps similar to the MBSIA crew—one that could serve as a career pipeline into the USFS.

139.      Roy was vehemently against the idea. Roy used her authority to prevent Davis' program from becoming a diversity pipeline for the USFS, including refusing to certify Williams—a 30-year fire fighting veteran.

134. In December 2017, Roy told Mr. Williams in no uncertain terms that he would need to go back and locate documentation from 30 years ago before she would approve him to take any fire assignments or he could take the training and classes over again, which would take him years to complete.

135.      Without ever hearing from Waters or speaking to her, Williams provided 15 allegedly "missing" documents and intended to provide the rest through third-party documentation.  However, almost four months later Roy and Waters claimed that Williams only provided **three** additional pieces of information.

136.      Williams learned that his instructors were dead and/or retired from USFS and unreachable.

Complaint – Page 23 –

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

137.     Neither Roy nor Waters ever advised Williams or his supervisor, Kurt Davis, of his other options.

138. Roy's actions are against the culture of the Agency which is to make every qualified resource available to fight fires.  It was certainly Roy's intent to discriminate and retaliate against Williams who by this time, had filed an EEO complaint.

139. The Agency has exercised discretion as per USFS policy in favor of white firefighters by permitting an alternative means of certification for white firefighters so they could accept fire assignments.  It has not exercised this same discretion in favor of Williams and other Black firefighters.

140. At this time, not only has Williams lost pay, but all of his qualifications have lapsed meaning there is no way for them to be immediately restored without judicial relief. Roy's discriminatory and retaliatory actions have ended the 30-year career as a veteran fire fighter and recruiter has ended.

## CAUSES OF ACTION
### Count 1: Hostile Work Environment
### (Violation of Title VII)

141. Williams incorporates every preceding paragraph as alleged above.

142.  At all relevant times USDA was an "employer" under Title VII.

143. At all relevant times Williams was an "employee" under Title VII.

144. Williams engaged in protected activity when he complained about his white subordinates' discriminatory conduct, challenged FS management's mishandling of

Complaint – Page 24 –

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

the fiasco resulting from the discriminatory conduct, and filed an EEO complaint on April 16, 2014.

145. USDA created and maintained an environment in which retaliatory intimidation, ridicule, and insult were so severe and pervasive that it altered the conditions of Williams' employment and created a retaliatory hostile work environment, in violation of Title VII.

146.  This ongoing retaliatory hostile work environment includes, but is not limited to, the following actions taken by FS management: dissuading Williams from filing an EEO complaint after he reported Larsen and Monteith's text messages, which included statements about engaging in violence and poisoning Williams by putting Visine in his water bottle, and the mounting racial tension among MSBIA crew members caused by the unlawful discriminatory conduct of Taylor, Larsen, and several other white crew members; instructing Williams not to talk about the text messages and the mounting racial tension among MBSIA crew members with anyone; stripping Williams of his MBSIA supervisory duties; suspending the MBSIA Crew; disbanding the MBSIA Crew; revoking Williams' authority to rehire, recruit, and fill positions for the MBSIA Crew; charging Williams with AWOL; interrogating Williams about false allegations of violent conduct; forcing Williams to work with two white subordinates who had antagonized him or talked about poisoning him; denying Williams' request for reassignment after his white subordinates falsely accused him of bringing a dangerous weapon to work and badgered him for filing an EEO complaint; and repeatedly threatening to terminate Williams.

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC 20002
Phone: (202) 792-4946

147.  The Agency intentionally deactivated Williams fire qualifications (decertified him) and created insurmountable obstacles with the purpose of making him lose pay, and dignity by forcing him to retire without he qualifications he worked 30 years to gain.   Meanwhile the Agency has routinely assisted white firefighters who have documentation missing with re-certification so that they have never lost fire hours, or much less been decertified.

148.  USDA is vicariously liable for the actions of every FS management actor involved in the events giving rise to this Complaint.

149.  USDA has directly and proximately caused Williams substantial economic loss, damage to his career and professional reputation, humiliation, pain, and suffering.

150.  USDA's actions were wanton, reckless, or in willful indifference to Williams' legal rights.

### *Count 2: Retaliation*
### (Violation of Title VII)

151.  Williams incorporates every preceding paragraph as alleged above.

152.  As a result of Williams' protected EEO activity, USDA took adverse employment actions against him. They include, but are not limited to, the following: dissuading Williams from filing an EEO complaint after Williams reported Larsen and Monteith's text messages, which included statements about engaging in violence and poisoning Williams by putting Visine in his water bottle, and the mounting racial tension among MBSIA Crew members caused by the unlawful discriminatory conduct of Taylor, Larsen, and several other white crew members; stripping Williams of his MBSIA Crew supervisory duties; revoking Williams' authority to rehire, recruit, and fill positions for

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

the MBSIA Crew; suspending the MBSIA Crew; disbanding the MBSIA Crew; revoking the option for Williams to do fire details; forcing Williams to work with two white subordinates who had antagonized him and talked about poisoning him; repeatedly threatening to fire Williams; and denying his request for reassignment after his white subordinates falsely accused him of bringing a dangerous weapon to work and badgered him for filing an EEO complaint.

153.  The Agency intentionally deactivated Williams fire qualifications (decertified him) and created insurmountable obstacles with the purpose of making him lose pay, and dignity by forcing him to retire without he qualifications he worked 30 years to gain.   Meanwhile the Agency has routinely assisted white firefighters who have documentation missing with re-certification so that they have never lost fire hours, or much less been decertified.  USDA's retaliatory actions were causally connected to Williams' protected activity.

154.  USDA's actions have directly and proximately caused Williams substantial economic loss, damage to his career and professional reputation, humiliation, pain, and suffering.

155.  USDA's actions were wanton, reckless, or in willful indifference to Williams' legal rights.

### Count 3: Discrimination (Race-Disparate Treatment)

156. Williams incorporates every preceding paragraph as alleged above.

157.  As a result of Williams' protected EEO activity, USDA took adverse employment actions against him. They include, but are not limited to, the following: dissuading Williams from filing an EEO complaint after Williams reported Larsen and Monteith's

Complaint – Page 27 –

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

text messages, which included statements about engaging in violence and poisoning Williams by putting Visine in his water bottle, and the mounting racial tension among MBSIA Crew members caused by the unlawful discriminatory conduct of Taylor, Larsen, and several other white crew members; stripping Williams of his MBSIA Crew supervisory duties; revoking Williams' authority to rehire, recruit, and fill positions for the MBSIA Crew; suspending the MBSIA Crew; disbanding the MBSIA Crew; revoking the option for Williams to do fire details; forcing Williams to work with two white subordinates who had antagonized him and talked about poisoning him; repeatedly threatening to fire Williams if he would not work with them; and denying his request for reassignment after his white subordinates falsely accused him of bringing a dangerous weapon to work and badgered him for filing an EEO complaint.

158.  The Agency intentionally deactivated Williams fire qualifications (decertified him) and created insurmountable obstacles with the purpose of making him lose pay, and dignity by forcing him to retire without he qualifications he worked 30 years to gain.   Meanwhile the Agency has routinely assisted White firefighters who have documentation missing with re-certification so that they have never lost fire hours, or much less been decertified.

159.  USDA's actions have directly and proximately caused Williams substantial economic loss, damage to his career and professional reputation, humiliation, pain, and suffering.

160.  USDA's actions were wanton, reckless, or in willful indifference to Williams' legal rights.

Complaint – Page 28 –

**PRAYER**

WHEREFORE, Williams requests relief against USDA as follows:

a.  Enter judgment in his favor against USDA for retaliation in violation of Title VII;

b.  Enter judgment in his favor against USDA for subjecting his to a retaliatory hostile work environment in violation of Title VII;

c.  Award him compensatory damages of $500,000.00;

d.  Award him punitive damages, in an amount to be determined at trial;

e.  Award him attorney's fees and the costs of this litigation;

f.  Award him back pay, front pay and future benefits as may be appropriate;

g.  Award injunctive relief in the form of restoring all of Williams' qualifications from June 22, 2017

h.  Enjoin USDA from discriminating against, retaliating against, or harassing him in any way;

i.  Award him appropriate prejudgment interest;

j.  Award such other relief as may be necessary and appropriate.

**JURY DEMAND**

Williams demands a jury trial.

DATED: August 31, 2020                                Respectfully Submitted,

                                                     s/ *Yaida O. Ford*
                                                     Yaida O. Ford (WSBA #48723)
                                                     **FORD LAW PROS PC**
                                                     10 G Street, new, Ste. 600
                                                     Washington, DC 20002

FORD LAW PROS PC
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946

Office: (202) 792-4946
*yford@fordlawpros.com*

*Attorney for Plaintiff*

**FORD LAW PROS PC**
10 G Street, NE
Washington, DC  20002
Phone: (202) 792-4946